19 F.3d 1440
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
Daniel LOGAN, Plaintiff-Appellant,
v.
Donna E. SHALALA, Secretary of Health and Human Services,
Defendant-Appellee.
 No. 92-56129.
 United States Court of Appeals, Ninth Circuit.
 Submitted Feb. 4, 1994.*
Decided March 18, 1994.
 
 Before: TANG, PREGERSON, and NOONAN, Circuit Judges.
 
 
 1
 MEMORANDUM**
 
 
 2
 Daniel Logan appeals the district court's grant of summary judgment in favor of the Secretary of Health and Human Services. Logan argues: (1) that the administrative law judge's (ALJ's) determination that Logan had the ability to control his consumption of alcohol was not supported by substantial evidence; (2) that the ALJ's decision to disregard the opinions of Logan's treating physicians was not supported by clear and convincing evidence; and (3) that the ALJ erred by not considering Logan's impairments in combination. We reverse and remand for an award of benefits.
 
 
 3
 I. The Opinions of Logan's Treating Physicians
 
 
 4
 On March 26, 1986, Logan suffered a right temporal skull fracture in a motorcycle accident. He underwent a craniotomy and a repair of a cerebrospinal fluid leak. After release from the hospital, Logan claims to have suffered from intense pain, dizziness, light-headedness, and hearing loss. On September 24, 1986, in an attempt to allay these symptoms, Logan underwent a labyrinthectomy (removal of the labyrinth, an organ of the inner ear which contains fluid and control equilibrium). Despite the surgery, Logan claims that the intense pain, dizziness, light-headedness, and hearing loss continued to persist. He alleges that he began to consume alcohol to relieve the intense pain and that he began to suffer from depression. Logan further alleges that his consumption of alcohol became uncontrollable and that his depression increased, rendering him disabled.
 
 
 5
 The reports of three treating physicians are found in the record: Drs. Erman and Schumer, Logan's treating psychiatrists at the UCSD Gifford Mental Health Center, and Dr. Engelhorn, Logan's private treating psychiatrist.
 
 
 6
 Dr. Erman's report indicates that he examined Logan on March 31, 1987, and on April 28, 1987. He diagnosed major depression with extreme stressor severity. He noted that Logan had withdrawn from society, had no social contacts and suffered from suicidal ideation. Dr. Erman concluded that Logan was "incapable of sustaining work or social relations" at that time.
 
 
 7
 Dr. Schumer's report dated August 25, 1987, indicates that Logan suffered from alcoholism, major depression, and mixed personality disorder with poor adaptive functioning. She noted that Logan's symptoms of depression included anhedonia, suicidal ideation and dysphoria, and that he expressed chronic hopelessness and frustration. Dr. Schumer concluded that "[Logan's] current inability to follow through on anything other than the simplest daily activities ... render[ed] him unemployable at [that] time." The record also indicates that Dr. Schumer presided over numerous therapy sessions with Logan.
 
 
 8
 Dr. Engelhorn reported by letter on three separate occasions. His first letter dated July 13, 1988, was written after seeing Logan on four different occasions. Dr. Engelhorn diagnosed major depression, mixed personality disorder and substance abuse. He noted that Logan experienced "withdrawal, fearfulness of people, seclusiveness and episodes of anxiety...." Dr. Engelhorn concluded that Logan was a "high suicide risk" and a "significantly disabled person."
 
 
 9
 Dr. Engelhorn's second letter dated June 19, 1989, describes Logan's condition as worsening. He noted that Logan continued to be chronically depressed and withdrawn, "with an overwhelming sense of hopelessness and despair." He also described Logan's seclusion and anxiety at leaving his apartment as "true agoraphobic symptoms." He remarked that Logan remained a "very high suicide risk" and found him to be "gravely ill."
 
 
 10
 Finally, Dr. Engelhorn's third letter dated July 23, 1990, notes that he continued to see Logan, but not on a regular basis. Dr. Engelhorn described Logan's status as much the same as in his second letter, but included more details concerning Logan's alcoholism. He noted that Logan claimed to consume a fifth of hard alcohol per day to relieve his pain, and that Logan believed alcohol to be more effective than his prescription medications at relieving pain. Dr. Engelhorn concluded that Logan had "no ability to control his alcohol intake at [that] time and [that] it certainly preclude[d] him from any and all types of employment." He also noted that Logan "demonstrate[d] an overall deterioration in his ability to handle stress, function in social settings and [that] certainly this [applied] to all types of work situations."
 
 
 11
 The medical opinions of treating physicians, as opposed to those of examining physicians, are accorded special weight. Embrey v. Bowen, 849 F.2d 418, 421 (9th Cir.1988). To reject the opinion of a treating physician which conflicts with that of an examining physician, "the ALJ must make findings setting forth specific legitimate reasons for doing so that are based on substantial evidence in the record." Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir.1989) (quotations omitted). In the absence of a contradictory opinion by another physician, the ALJ can disregard the opinion of the treating physician only by setting forth clear and convincing reasons. Id.
 
 
 12
 The ALJ disregarded the reports of Logan's treating physicians, specifically Dr. Engelhorn's letters, on the basis that they were controverted by the treatment notes from the UCSD Gifford Mental Health Center.[1] The ALJ relied on two inconsistencies: (1) that many treatment notes state that Logan denied suicidal ideation, which was inconsistent with Dr. Engelhorn's assertion that Logan had been a constant suicide risk; and (2) that while Dr. Engelhorn concluded that Logan could not control his consumption of alcohol, the treatment notes indicate that he could.
 
 
 13
 While some treatment notes state that the Logan denied experiencing suicidal ideation, many treatment notes state that Logan admitted to experiencing suicidal ideation. Logan's status changed from week to week. That Logan denied suicidal ideation some weeks is not to say that he was not a constant suicide risk. Moreover, many of the treatment notes were made by Dr. Schumer; Dr. Schumer specifically found in her report that "[t]his patient now is a chronically high risk for suicide." In any case, the treatment notes repeatedly describe Logan's long-standing depression, which was the basis for Dr. Engelhorn's conclusion that Logan was a constant suicide risk.
 
 
 14
 Furthermore, the treatment notes generally indicate Logan's chronic alcohol abuse. The single treatment note on which the ALJ relies to support his finding that Logan articulated his ability to control his consumption of alcohol is far from conclusive. Logan's "articulation" consists of two sentences written by his therapist claiming that Logan said that if his neuropsychological tests were rescheduled, he would not drink beforehand, and that if he was denied SSI benefits, he would start drinking again. Given the considerable evidence in the record evincing Logan's alcohol abuse, including the ALJ's finding that Logan suffered from a substance abuse disorder, these two sentences are far from the substantial medical evidence on which the ALJ claims to have based his determination.
 
 
 15
 On the whole, we find that the treatment notes support Dr. Engelhorn's conclusions. Accordingly, we find that the ALJ's reliance on the treatment notes to disregard the opinions of Logan's treating physicians falls short of being clear and convincing or based on substantial evidence.
 
 II. Logan's Credibility
 
 16
 Credibility determinations are the province of the ALJ. Fair v. Bowen, 885 F.2d 597, 604 (9th Cir.1989). Because the opinion of a treating physician may be disregarded if it was based on the subjective complaints of a claimant who is found not credible, see Brawner v. Secretary of Health and Human Servs., 839 F.2d 432, 433-34 (9th Cir.1988), we must review the ALJ's determination that Logan's testimony was not credible. A credibility determination must be supported by substantial evidence. Id. at 433.
 
 
 17
 The ALJ's finding that Logan's testimony was not credible was based on two grounds: (1) that Logan did not have sufficient financial resources to purchase the amount of alcohol he claimed to drink, and therefore, he must have been exaggerating or lying; and (2) that two of Logan's examining physicians, Drs. Bergsma and Hillyard, stated that they believed that Logan intentionally exaggerated his difficulties or "faked" bad results.[2]
 
 A. Logan's consumption of alcohol
 
 18
 Logan received general relief of $291 per month and $78 per month in food stamps. In addition to $200 per month for rent, Logan claimed only $30 per month in expenses. The expenses included $5 per month for his phone bill, bus fare, and $16 per month for his maid to run errands. Logan claimed no other incidental expenses. Thus, he was left with approximately $60 per month to spend on alcohol, perhaps a little more if he sold some of his food stamps or possessions as he testified doing.
 
 
 19
 Based on Logan's testimony of his consumption, that is one to one and one half fifths of alcohol, four to six times per week and assuming $3.50 per fifth, Logan would have to spend somewhere between $55 and $135 per month on alcohol. Since Logan's funds were sufficient to buy only an amount at the low end of this range, namely $60, his testimony in this regard may have been slightly exaggerated.
 
 
 20
 However, there is no indication in the record that Logan was attempting to mislead the ALJ by his testimony. In fact, he specifically testified that he spent $60 per month on alcohol, and openly admitted that there were days when he did not consume alcohol because he was out of alcohol or out of money. When questioned further about the amount of alcohol he consumed, Logan's answers were clearly estimations. For example, although Logan testified that he consumed one to one and one half fifths of alcohol per day when he consumed alcohol, he also testified that there were days when he would not consume an entire fifth of alcohol.
 
 
 21
 With these facts, we do not believe that Logan's possible exaggeration concerning the amount of alcohol he consumed is substantial evidence supporting the ALJ's credibility determination. We also find it interesting to note that many of the ALJ's questions and remarks during Logan's testimony contain the same type of exaggerations for which he found Logan not credible. Logan testified that he spent $3.50 per fifth of alcohol; the ALJ rounded this figure to $4.00. Logan testified that he would consume one to one and one half fifths of alcohol per day; the ALJ's calculations assumed one and one half fifths of alcohol. Logan testified that he consumed alcohol four to six days per week; the ALJ's calculations assumed Logan consumed alcohol every day. Thus, according to the ALJ, Logan spent $180 per month on alcohol, which is three times the amount at the low end of the range to which Logan actually testified, and $45 more than the high end of the range.
 
 B. Exaggerating difficulties
 
 22
 Two of Logan's examining physicians, Drs. Bergsma and Hillyard, stated that they believed that Logan intentionally exaggerated his difficulties or "faked" bad results. However, neither Drs. Bergsma or Hillyard dealt in any great detail concerning the extent of Logan's exaggerations. Despite believing Logan to exaggerate, both Drs. Bergsma and Hillyard nevertheless concluded that Logan's depression and substance abuse genuinely impaired his capacity for employment. Moreover, Logan's three treating physicians saw him on many more occasions than Drs. Bergsma and Hillyard, and none of their reports indicate that Logan was exaggerating or lying. Drs. Bergsma's or Hillyard's vaguely articulated beliefs are not substantial evidence to support the ALJ's credibility determination.
 
 
 23
 We therefore find that the ALJ's credibility determination concerning Logan is not supported by substantial evidence.
 
 III. Conclusion
 
 24
 The decision to remand or simply award benefits is within the discretion of the court. Varney v. Secretary of Health and Human Servs., 859 F.2d 1396, 1399 (9th Cir.1988). Since no legitimate reasons are given for disregarding the opinion of Logan's treating physicians and since the ALJ's credibility determination is not supported by substantial evidence, we remand for an award of benefits.[3] See Winas v. Bowen, 853 F.2d 643, 647 (9th Cir.1987); Varney, at 1400-01.
 
 
 25
 We note, however, that although the record indicates that Logan's psychiatric and alcohol related problems remain serious, Logan may no longer be enrolled in any treatment program. We condition the award of benefits, therefore, on Logan's receipt of publicly funded treatment for his psychiatric and alcohol related problems, if and when available. See Kellar v. Bowen, 848 F.2d 121, 124 (9th Cir.1988) (remanding alcoholism claim with stipulation that Secretary should consider conditioning benefits on receipt of treatment); Cooper v. Bowen, 815 F.2d 557, 561 (9th Cir.1987) ("Given the nature of alcoholism, awarding benefits may not help the claimant if he or she spends the money on alcohol, exacerbating the disabling condition.... We now endorse [the approach adopted by several other circuits], and require the Secretary to consider on remand [conditioning benefits on receipt of treatment].").
 
 
 26
 REVERSED and REMANDED for an award of benefits, conditioned on Logan's receipt of publicly funded treatment for his psychiatric and alcohol related problems.
 
 
 
 *
 The panel unanimously agrees that this case is appropriate for submission without oral argument. Fed.R.App.P. 34(a); 9th Cir.R. 34-4
 
 
 **
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 Logan attended individual and group therapy sessions at the UCSD Gifford Mental Health Center from March of 1987 through May of 1989. A therapist would preside over these sessions and record his or her observations of Logan's behavior
 
 
 [2]
 In addition, Dr. Robert Paxton, a psychiatrist who appeared as a medical expert at Logan's hearing, testified that after reviewing the record it was his opinion that Logan's test results were inaccurate due to Logan's "uncooperativeness and lack of good effort."
 
 
 [3]
 Because we reverse and award benefits on the ground that the ALJ improperly disregarded the opinions of Logan's treating physicians, we need not address Logan's arguments that the ALJ erred by finding that he had the ability to control his consumption of alcohol or by not considering his impairments in combination